UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARREN L. WASHINGTON,

                         Plaintiff,                CASE NO.

V

                                            HON.

FORENSIC FLUID LABORATORIES,
INC., BRIDGET LEMBERG and
DAVID BERGLAND,

Jointly and Severally, Defendants.

_____

Marlo D. Bruch (P70362)
Attorney for Plaintiff
Bruch Law Offices, PLLC
5955 West Main Street, Suites 224-225
Kalamazoo, Michigan 49009
Tele:  (269) 312-8169
Fax:   (269) 743-1181
mdbruch@bruchlawoffices.com

_____

There is no other pending or resolved civil action arising out
of the transaction or occurrence alleged in the complaint.

**VERIFIED COMPLAINT**

NOW COMES Plaintiff, Darren L. Washington, by and through his attorney,

Bruch Law Offices, PLLC, and for his Complaint against Defendants, Forensic Fluid

Laboratories, Inc., Bridget Lemberg and David Bergland, states as follows:

**PARTIES AND JURISDICTION**

1.      This is an action for Count I- Race Discrimination pursuant to the Title

VII of the Civil Rights Act of 1964, as amended; Count II- Retaliation for Protected

EEOC Activity pursuant to Title VII of the Civil Rights Act of 1964, as amended; Count

III- Violation of Age in Discrimination Act of 1967 ("ADEA") as amended; IV- Gender Discrimination in violation of Title VII of the Civil Rights Act of 1964 (male), as amended; and, the Equal Pay Act of 1963 as amended; and Count V- Race Discrimination in violation of 42 USC 1981 acting under 42 USC 1983.

2.      Plaintiff, Darren L. Washington ("Plaintiff and/or Washington"), is an African-American male and is an individual who, at all times during the events alleged in the Complaint, was an employee of Defendant, Forensic Fluids Laboratories, Inc. ("FFL"), located in the City of Kalamazoo, Kalamazoo County, Michigan and who resides in the County of St. Joseph, State of Indiana.

3.      Defendant, Forensic Fluids Laboratories, Inc. ("FFL") is a for profit corporation incorporated in Michigan, located in the City of Kalamazoo, Kalamazoo County, Michigan.

4.      Defendant, Bridget Lemberg ("Lember") (female Caucasian) was Bergland's direct supervisor involved in making decisions regarding Plaintiff's employment including but not limited to the "cat's paw theory."

5.      Defendant, David Bergland ("Bergland") (male Caucasian), always was Plaintiff's direct supervisor who had the decision-making authority according to the terms and conditions of Plaintiff's employment.

6.      Defendant Employer was and is an "employer" as defined by Title VII, the Civil Rights Act of 1964 as amended and the Age Discrimination in Employment Act of 1967, as amended.

7.      The basis for this Court's jurisdiction is proper pursuant to 28 U.S.C. §1331.

8.     Jurisdiction and venue are proper in this Court, as Defendant FFL is doing business in Kalamazoo County, Michigan; Plaintiff was employed in Kalamazoo County Michigan with Defendant and is thus subject to the Court's personal jurisdiction and venue due to the nature of his employment agreements and personnel file.

9.     The events giving rise to this cause of action occurred in Kalamazoo County, Michigan.

10.     The amount in controversy exceeds $75,000 exclusive of interest, costs and attorney fees and this matter is otherwise within the jurisdiction of this Court.

## COMMON ALLEGATIONS

11.     Plaintiff reincorporates by reference the previous paragraphs of the Complaint as though fully set forth herein, word for word and paragraph for paragraph

12.     March 11, 2017, Washington was hired as a Regional Sales Representative by Jeff Swearingen for Forensic Fluids Laboratories ("FFL") headquartered in Kalamazoo Michigan and the only African American employee in sales.

13.     Washington was employed by this company two years and one month and led the sales team in new accounts before his separation in April of 2019.

14.     Washington was named "Most Valuable New Employee in 2017.

15.     Washington was responsible for securing and retaining new business and maintaining existing clients in his territory.  Washington was responsible for training Michigan DHHS and Indiana DCS case workers on how to administer FFL oral fluid drug test due to FFL's contract with state of Indiana and Michigan.

16.     Washington's sales territory was a portion of Indiana, Michigan, and all of Illinois.

17.     FFL had another Sales Representative, Eric Brown, in Indiana and Rhonda Haines in Michigan.

18.     Eric Brown resigned in February of 2018, and Rhonda Haines resigned in November of 2018.

19.     FFL asked Washington to cover the entire state of Indiana when Eric Brown resigned and the entire state of Michigan when Rhonda Resigned.

20.     Washington was told by David Bergland and Jeff Swearengin (Director of Sales who quit in October of 2018) that he would be compensated extra for travel and extra for managing existing accounts that had been left over by Eric Brown.

21.     Washington was told by David Bergland that when Rhonda Haines quit that he would be compensated for managing her sales territory in December of 2018.

22.     Washington had that conversation with David Bergland and Bridget Lemberg in January of 2019 and was told again that he would be compensated extra for his work.

23.     Since the resignation of Eric Brown and Rhonda Haines was responsible for covering the entire States of Indiana, Illinois and Michigan Washington was also expected to take on new sales leads that came into the office through FFL's Customer service Department including all new and existing accounts, and provide employee trainings for Michigan DHHS and Indiana DCS.

24.     Washington was also responsible for taking part in the interviewing process to hire new representatives for Indiana and Michigan.

25.     This was also added responsibility and no new sales representatives were hired before Washington was unlawfully terminated from FFL.

26.     In December 2017, Washington was awarded an $2,500.00 end of the year bonus.

27.     Michigan Sales Representative Rhona Haines got $8,000.00.

28.     Ohio Sales Representative Holly Ontko got $10,000.00.

29.     Neither female had the sales, clients or goal numbers as Washington and received preferential treatment based on being females.

30.     Washington found this information out after he had been unlawfully terminated.

31.     Washington led the DOA (Drugs of Abuse) sales team in new accounts until he was unlawfully terminated.

32.     On February 9, 2018, Eric Brown Resigned, former Indiana FFL Sales Representative, Washington was asked by Dave Bergland to start covering his territory.

33.     March 23, 2018, Washington was provided with his first FFL Performance Evaluation Review to cover March 2017 thru March 2018.

34.     On September 25, 2018, Washington received an invitation to be honored with an award by the Indiana Commission on the Social Status of Black Males for the work for that he did as the First Executive Director of the Commission and mentoring Black males.

35.     This achievement was shared on the FFL companywide email. Washington also got a congratulatory call from Bridget Lemberg and Dave Bergland thanking him for the work that he did in the African American Community.

36. During the month of September 2018, Washington spoke with his supervisor Jeff Swearingen concerning the 40,000 miles he put on his personal vehicle since leasing a new car in August of 2017.

37. Washington asked him to speak with Dave Bergland concerning his lease due to unexpected demand for additional travel for FFL. (The monthly vehicle allowance was $600.00 before taxes).

38. Washington's supervisor Jeff Swearingen provided mid-year evaluations Washington's sales team in September 2018, but Washington was not given a mid-year evaluation.

39. Rhonda Haines, Holly Ontko, Rick Margraf, and Rebecca Schwei were provided with Mid-year evaluations who were not African American.

40. Washington asked Jeff Swearingen about his mid-year evaluation and was informed that he did not need a mid-year evaluation because he was doing a great job.

41. Washington was also told that he would get an end of the year evaluation in March of 2019.

42. On October 2018, FFL Sales Director Jeff Swearingen resigned.

43. The DOA sales team had a conference call with Dave Bergland the day after Jeff Swearingen resigned and were told by Dave Bergland to report to Heidi Toornman for drug test pricing, and to him for all other issues.

44. The DOA sales team had a meeting at the corporate office in Kalamazoo Michigan concerning the departure of the FFL Sales Director Jeff Swearingen.

45.     All members of the DOA sales team were interviewed by David Bergland and Bridget Lemberg concerning a sexual misconduct complaint that was filed by Wisconsin Regional Sales Representative Rebecca Schwei.

46.     Rebecca Schwei reported to management that Jeff Swearingen (Former DOA Sales Director) made inappropriate comments of a sexual nature to her that were not true.

47.     Washington also informed Bridget Lemberg and Dave Bergland that he was the only DOA sales representative who did not get a mid-year evaluation in September 2018.

48.     Washington was told by Dave Bergland that he would speak with Heidi Toornman to get him an evaluation.

49.     On November 2018, Michigan Sales Representative Rhonda Haines resigned.

50.     Washington was asked by Dave Bergland and Bridget Lemberg to cover her territory and was told by Dave Bergland that FFL would give him $6,500.00 before taxes to help with his personal vehicle expenses.

51.     On December 2018, Washington was informed by way of conference call with Dave Bergland and Bridget Lemberg that he would be awarded $6,000.00 for his end of the year bonus (Washington was told by Bridget Lemberg on April 3, 2019 that he was approved to get $10,000.00).

52.     During January 2019, there was an FFL employee email that was sent out stating that Ivars Steins was no longer working for the company.

7

53.    DOA sales had a meeting at corporate office in Kalamazoo Michigan, and they were provided with new Verizon Tablets.

54.    A Ohio Regional Sales Representative Rick Margraf informed Washington that his inside contact told him that FFL purchased at least $10,000 worth of Tablets from Rebecca Schwei fathers' business.

55.    Margraf was also informed that since her complaint, that Rebecca Schwei was provided with an extra $1,000.00 added to her commission due to the fact, she was not making new sales since being hired.

56.    Washington was asked by David Bergland to travel to the corporate office in Kalamazoo to assist in interviewing candidates to fill the Indiana and Michigan Regional Sales Representative positions.

57.    During February 2019, the video labeled **"On the Road"** was sent to the DOA Sales Team highlighting Washington's travels to conduct trainings for courts, child services and attending conferences for FFL.

58.    The same video was also played multiple times on March 11, 2019 in the FFL employee breakroom for FFL staff to see the work Washington was doing in the field.

59.    Washington was told by Dave Bergland that he would get a performance evaluation Review in March 2019.

60.    Having yearly reviews in sales is important because potential employers in the pharmaceutical industry ask to review previous sales performance evaluations.

61.     On March 11, 2019, during the FFL Monday morning conference call, Washington was called a Black Horse and Dark Horse by Chief Operating Officer Dave Bergland. *(Emails document and detail the incident).*

62.     After the conference call, Washington sent an email to Erin Michael (Recruiting/Training Coordinator), Chelsey Wyant (former Chief of Staff), and Bridget Lemberg (Lab Director/CEO) reporting the incident.

63.     That evening at 8:45pm, David Bergland sent an email to everyone that was on the conference call informing them that they would have an emergency call the next morning on 3/12/2019. The following individuals were on the conference call:

1.  Dave Bergland
2.  Holly Ontko
3.  Joan Vansickler
4.  Molly Korinek
5.  Rick Margraf
6.  Rebecca Schwei
7.  Darren Washington

64.     Joan Vansickler (Marketing Director) was in the conference room with David Bergland when he made the comments. Washington also saved the voicemail that Joan Vansickler sent him concerning the incident.

65.     Washington got calls from fellow Kentucky Regional Sales Representative Rick Margraf and Ohio Regional Sales Representative Holly Ontko. They both shared how they were offended by the racist remarks that were spoken by Dave Bergland.

66.     Holly Ontko noted the fact that she was somewhat offended as a white woman who has a bi-racial child with an African American Man.

67.     During March 12, 2019, at 8:00am Dave Bergland convened his requested conference call and informed the participants that Washington was the one who reported

him to management, and he was sorry if he offended anyone on the call the day before. (they were told that all conference calls are recorded and stored). Washington was scheduled to be in Indianapolis at 3:00pm for the Indiana DCS Drug Testing RFP pre-conference meeting.

68.    Around 1:00pm, Washington arrived in Indianapolis Indiana to meet with Bridget Lemberg, David Bergland, Phil Sims, and Garret Watson to discuss strategy before their 3:00pm meeting with the Indiana Department of Administration. Upon arriving at the restaurant, Dave Bergland met Washington outside and began to apologize and Washington asked him where everyone was. They went into the restaurant and had their meeting.

69.    After the meeting around 4:00pm Bridget Lemberg, Dave Bergland, and Washington had a brief conversation after their meeting with the Indiana Department of Administration. Bridget Lemberg stated in the conversation as she did in the email that their Labor Attorney advised them that Dave Bergland should address the group concerning the comments that he made during the L10 call on Monday morning. (Since the information was shared with the entire group the attorney-client privilege carried by the employer was broken). She also stated as in her email that they should discuss how they could work this situation out. Washington informed her at this time he could not give them any ideas on how this could be worked out, and that they would need to discuss that with Human Resources and their Labor Counsel. Washington told her and David Bergland that he was still trying to process this entire situation. Washington did inform them that he disagreed with the advisement that they were given, and his confidentiality had been breached.

70.     During March 20, 2019. Washington was able to recruit Ira Green to apply

and interview for the Michigan Regional Sales Representative with FFL.  Ira Green is an

African American Man who was working as a Foster Care Caseworker with the Michigan

Department of Health and Human Services.

71.     Heidi Toornman sent Washington a text message asking him would it be

possible for him to come to the corporate office and participate in the face to face

interview with Ira Green.  Washington informed Heidi Toornman that since the incident

that took place with Dave Bergland on 3/11/2019, he did not feel comfortable in

participating in the interview with Ira Green.

72.     On March 28, 2019, Washington was called by Ohio Regional Sales

Representative Holly Ontko and was told that Bridget Lemberg called her and asked her

how she felt about Dave Bergland comments towards Darren Washington.  Holly stated

that she told Bridget that she should be speaking to Washington about the situation and

how she feels doesn't matter.  She stated that Bridget told her that she was advised by her

FFL Attorney not to speak with Darren Washington. The attorney-client privilege was

broken as the privilege was not with Ms. Ontko but Ms. Lemberg.

73.     Holly Ontko told Washington that Bridget told her that when she found

out that Washington was not being paid the same base salary as the other sales

representatives, she increased his salary to $65,000.

74.     On April 3, 2019, Washington was asked to attend a meeting with FFL

President Bridget Lemberg and Human Resources Consultant Kevin Brozovich on April

3, 2019 at 1:00pm.  Kevin was the FFL HR Consultant that worked with FFL due to the

fact that FFL did not have a qualified person who was responsible for human resources

responsibilities. In Washington's two years with FFL, this was the first time that he was going to meet this individual. **This was the first time that Washington had met with anyone to discuss this issue in specific details since the incident happened on Monday, March 11, 2019.**

75.     During the meeting, Washington was able to discuss in detail the past and current racial harassment, a wage disparity discrimination by Forensic Fluids and Dave Bergland since being employed by this company. In this meeting Washington provided documentation for the following:

     a.     Pay stubs showing how Washington was paid $5,000.00 less in base salary compensation than all the sales representatives that Washington had worked with and currently worked with. Washington made $60,000.00 and the other sales representatives made $65,000.00.

76.     Washington was not aware of this until he got a call from fellow sales representative Holly Ontko on March 29,2019. Washington was informed by Holly that Bridget Lemberg told her that he was making less than the other sales representatives and that she changed Washington's salary last year.

77.     Washington provided his pay stubs showing that his pay was increased on 7/20/2018 and that he was owed back pay for 15 months.

78.     Washington was never informed by David Bergland, or Bridget Lemberg that he was going to get an increase in pay from $60,000.00 to $65,000.00.

79.     This only became a topic of discussion after Washington reported the racist remarks that were made to him on March 11, 2019.

80.     Why would Bridget discuss Washington's pay with a fellow employee (Holly Ontko) who was in the same position (Regional Sales Representative).

81.     In this meeting Washington was informed by Bridget that he was approved to get a $10,000.00 bonus at the end of the year 2018 because of his great performance.  Washington showed her his check stub to show that he only got $6,000.00.

82.     Washington reminded her about the $6,500.00 money he was given for his vehicle in 11/2018 by Dave Bergland that she was aware of.  Washington asked his supervisor at the time (Jeff Swearengin) for extra money to put towards his car, because in 10 months he had put over 40,000 miles on his personal vehicle and was only getting $600.00 a month for a car allowance (before taxes).  Bridget and Dave Bergland agreed and gave him $6.500.00.  What Washington found out (after Bridget Lemberg informed him of during this meeting) was that he was approved to receive $10,000.00 bonus at the end of 2018.

83.     Washington informed Bridget and Kevin Brozovich during their meeting that he was owed an additional $4,000.00.  Dave Bergland took $4,000.00 of his bonus and added $2,500.00 for a total of $6,500.00. (Washington provided both with documented paystubs during this meeting) This is another example of discrimination at FFL, and the unethical and illegal behavior of Dave Bergland.

84.     Bridget stated that Washington was approved to get $10,000.00 for his bonus, and the $6,500.00 was for Washington's car.  Bridget admitted this was wrong and said she would take care of the situation.

85. Bridget was not telling the truth because Washington was on a conference call with her and David Bergland in December 2018 Washington was told by David Bergland that he would get an annual bonus of $6,000.00.

86. During that meeting Washington provided them with copies of an email he got from Heidi Toornman who served as Director of Customer Service. The email was concerning a questionable action that Washington was told to take concerning a potential client. At this time Washington's former Supervisor (Jeff Swearingen) resigned and all Sales Representatives were mandated by David Bergland to report to Heidi to determine pricing for potential clients.

      a. On Wednesday, October 24, 2018 Heidi Toornman advised Washington to use his **"charm"** with a female employee of a potential customer.

87. Washington told them that the week of March 25, 2019, he was at the corporate office in Kalamazoo and Washington was sitting in a conference working on his laptop computer and Heidi Toornman came in the conference room to speak with Washington about the FFL Web Portal. Washington informed them that during the conversation, Heidi got up and closed the door to finish their conversation. Washington told them that he thought this was extremely unusual and he was concerned as to why she would perform this action due to the tension surrounding the incident that happened on the March 11, 2019 conference call.

88. Washington asked Kevin Brozovich during their meeting with him and Bridget Lemberg if he was familiar with the "Me Too" Movement, and the increasing number of lawsuits filed against men for alleged sexual misbehavior, and he said yes. Washington informed them that if the roles were reversed, the same actions took place

and Heidi Toornman worked under Washington's supervision his actions would be a cause for concern. Kevin Brozovich and Bridget Lemberg agreed and said that Washington's concern would be anonymously addressed with Heidi Toornman.

89.     During the April 3, 2019 meeting Kevin Brozovich asked Washington to trust him that while the issue has not been formally addressed with Dave Bergland, but it would. He also stated that if there would be any disciplinary-action that Washington would not be able to know what type of disciplinary action was given. He also stated that he believed that the names that David Bergland called Washington were bad and unprofessional but was not racist nor a cause for job termination. Washington informed Kevin Brozovich that he had a concern that this incident happened on March 11, 2019 and it was April 3, 2019 and no action had been taken. Washington also informed him of the uncomfortable situation Dave Bergland put him in when he apologized on a conference call on March 12, 2019. During that call he informed everyone that Washington was the one who reported him to the company.

90.     Kevin Brozovich told Bridget at that point "Who told you to have David name Darren as the one who reported him to the company? because that was not the correct thing to do. "You are to never out the person who made the complaint" **Bridget stated that it was their FFL Attorney who told her to have David Bergland apologize and name Darren Washington as the one who reported him to Management. Again the attorney-client privilege was broken with the employer by sharing this information with the group.** Kevin then told Washington that they could not blame Dave Bergland based on the bad counsel that they got from their labor attorney. Washington informed Kevin that he disagreed, because in Dave Bergland's apology he

stated that in over fifty years of experience had never been accused of such a claim. Washington told Kevin, that he must be held accountable for what he said. Kevin then told Washington that he would be notified when action had been taken with Dave Bergland, but he could not tell Washington what type of disciplinary action was taken and could not promise any would be taken.

91.     Washington informed Kevin and Bridget when Dave Bergland asked him before a meeting with the Indiana Department of Child Services in Indianapolis. "How are you getting these new sales with the type of background you come from". "How can we get more diamonds in the ruffs like you."

92.     Washington told them about the time that Dave Bergland called him after a presentation Washington gave with the Kalamazoo DHHS he and Jeff Swearengin attended and said "How did you learn to speak and articulate so well with your background and where you come from."

93.     Kevin asked Washington why he didn't say anything before now. Washington informed Kevin that the "Black Horse, Dark Horse" comment was the last straw for him. As one of the two of three African Americans that worked for FFL and the only African American in sales, Washington was concerned about rocking the boat. Washington would be labeled as an angry black man who took Dave Bergland's comments out of proportion. Washington also reminded Kevin that his earlier comments stating that he felt Dave Bergland's comments were not racist is a reason why people of color and women don't report harassment.

94.     Bridget stated that she would get back to Washington on the money that he was owed after she did some calculations. Washington informed Bridget that in

addition to pay inequality, he was promised by Dave Bergland that he would get the commission and a portion of the $65.000.00 salary that Eric Brown and Rhonda Haines had since Eric Brown's departure date of February 2018, and Rhonda Hanie's departure date of November 2018.

95.     During their meeting Washington told Kevin and Bridget that on Friday, March 29, 2019 he received a payment of $4,500.00 direct deposited into his account. Washington asked what this payment was for and why was he not told that he would get this money. Bridget stated that Dave Bergland told her it was for all the travel and extra work Washington was doing out of his territory since January of 2019. Washington told her that this was not the correct amount based on what David told him what he would get. She said that she would go back and work the numbers and they would have another meeting.

96.     On April 10, 2019, around 3:00pm or after, in a meeting with Kevin Brozovich and FFL President Bridget Lemberg. A few things to note:

    a.  Since the incident, on March 11, 2019 Washington had continued to perform his employment responsibilities without objection;

    b.  On Tuesday, April 9 thru April 10, 2019 all the sales team was at the FFL corporate office in Kalamazoo for their 2-day quarterly staff sales meeting.

    c.  During those two days all members of the sales team were interviewed by HRM Innovations who were hired by FFL to develop and conduct an assessment of the work culture at FFL. All employees of FFL were interviewed by Kevin Brozovich (President of the HRM Innovations) and

his partner. Washington was also interviewed by Kevin Brozovich for this assessment.

d. On Sunday, March 31, 2019 Bridget Lemberg sent a companywide email informing all FFL Staff that their company was not awarded the Drug testing contract with the Michigan Department of Health and Human Services. This contract was worth about 12 million dollars for the company. The contract ended 8/1/2019, but all testing ended with FFL on June 1, 2019.

e. On Friday, March 29, 2019 an email was sent by Heidi Toornman to the sales team informing them that Dave Bergland would be on vacation in Florida during the week of April 1, 2019, and she will be leading the L10 sales call. Washington respond back "ok", and he was on the sales call on April 1, 2019.

f. Washington fully participated in the 2-day quarterly staff meeting. At this time, Dave Bergland was back at work and led the 2-day quarterly staff meeting. At the end of the meeting on Wednesday, April 10, 2019 all participants were asked to rate the meeting.

97.    Washington rated the meeting a 6. Washington explained to the entire group (Bridget Lemberg was at the meeting) that they seemed to be moving in a positive direction due to the work over the last two days. Washington then looked at Dave Bergland and told everyone that the only reason why he was going to make the next comment in front of everyone was because 90% of everyone in the room was on the conference on March 11, 2019 and he was outed as the one who made the complaint

18

against Dave Bergland. Washington then told Dave Bergland that this was the first time that he had been able to address everyone since the incident, and if another staff member would had said the same things that he said to Washington on the March 11, 2019, conference call they would not have a job. Washington told him that his remarks were horrible, disrespectful, and his apology was not sincere. Bridget then stated that the company was still working on this issue.

98.     After the quarterly meeting Washington was called into a meeting with Kevin Brozovich and Bridget Lemberg and was provided with a letter. Bridget then went over with Washington the sales commission numbers for Eric Brown and Rhonda Haines. She told Washington based on their commission numbers and the back pay that he had owed the total amount that he was owed (including the $4,500.00 from the end of March 2019) was $11,500.00. Washington informed Bridget from her calculations she was missing the percentage of Eric Brown and Rhonda Haines base salary of $65,000.00 that he was promised. Washington told her that she had not included the additional mileage money that he was promised to get paid for covering Eric Brown and Rhonda Haines territories while they were interviewing potential replacements.

99.     Washington told Bridget during the meeting that the calculations that she used to determine what commission that he would get was not based on the correct percentages.

100.     Due to their yearly percentage changed in FFL commission structure, she based Washington's commission payment as if he had the additional accounts (Eric Brown and Rhonda Haines accounts that Washington was covering) since he started with

the company. Washington explained to her that her calculations should be as if the accounts were new accounts (this would have given him more in commission).

101.    On Thursday April 11, 2019 Washington sent an email to Kevin Brozovich and Bridget Lemberg (after being able to fully review the letter she provided to Washington) expressing his concern about the unfairness of the non-compete agreement, and had him continue to work under the supervision of David Bergland when his actions were not properly addressed. Washington also asked for a timeline as to when this would be addressed in their meeting and they refused to tell him during the meeting.

102.    On Thursday April 11, 2019 Washington sent Kevin Brozovich an email asking if FFL had an EAP program in place due to feeling depressed after their meeting on April 10, 2019. He responded by email and informed Washington that FFL had a program and provided him with a telephone number.

103.    Washington was sent an email on Friday April 12 or April 15, 2019 from Bridget asking him to have a meeting on April 16, 2019 at 1:00pm by way of conference call or he could come into the office. Washington told her a conference call would be better because he had an Oral Fluid Training in Indianapolis with the Indiana Department of Child Services, and a new client training in Jasper Indiana.

104.    On April 16, 2019 during the 1:00pm conference call Washington was told by Kevin Brozovich with Bridget on the call (Washington didn't know if anyone else was in the room) that they were going to sever their employment relationship. Washington was asked why, and Kevin Brozovich said because of the email that Washington sent him and Bridget on April 11, 2019 they felt that he would not be able to work under Heidi Toornman, and he was not attending sales call meetings based on the letter Bridget gave

Washington on April 10, 2019. He stated that when they left the meeting on April 10, 2019, they all seemed to be in agreement in his participation in sales meetings.

105. Washington reminded them of what she said to him in an email and the things Dave Bergland said to him on March 11, 2019 and in the email, Washington stated that he could not work under Dave Bergland, not Heidi Toornman. Washington reminded them that he was currently working under Heidi Toornman to get pricing finality to secure potential new contracts.

106. When Dave Bergland placed himself over the sales team with Bridget Lemberg's approval he had a conference call with the sales team (when their supervisor Jeff Swearengin resigned) and informed them that he took over the responsibilities of directing the sales team *and that they were to report to Heidi Toornman for all pricing decisions for potential clients.* That email dates to 10/24/2018. So, Washington had been under her supervision for over six months. If what she said had the same effect on Washington as what Dave Bergland said, he would had reported back in October of 2018.

107. Washington's comments concerning her in the April 11, 2019 email was just a reminder of their lack of sensitivity towards this issue and over a month had passed and they had not addressed these issues.

108. Kevin was the one who stated that they would speak to Heidi Toornman and let her know about what was told to them. Washington never officially reported Heidi Toornman.

109. Kevin comments that Washington not attending sales meetings were not true. Washington informed them that the week of April 1, 2019 he attended the sales L10 call that was chaired by Heidi Toornman.

110.    Washington reminded Kevin that Bridget's April 10, 2019 letter stated that he actively participated in all scheduled sales meetings. There had not been a sales meeting since April 1, 2019. Dave Bergland canceled the April 8, 2019 sales call due to the sales team having the quarterly meeting on April 9 and 10 2019. Heidi Toornman emailed the sales team on Monday, April 15 2019 to cancel the sales conference call due to them just finishing their quarterly meeting, and he responded okay.

111.    On April 16, 2019, how could Washington not comply with Bridget's request in that letter "to attend sales meetings and to have a cooperative approach to working with the leadership of your team" when he had not been given a chance?

112.    Washington was informed by a current employee that a companywide email went out informing the employees that Washington was no longer an employee. Two hours later a companywide email went out stating that Heidi Toornman (Director of Customer Service) would be the Director of the DOA (Drugs of Abuse) sales team

113.    Washington was emailed a separation Agreement and Release of All Claims to review and sign.

114.    On April 16, 2019, Plaintiff was terminated from his employment in retaliation for engaging in previous charges of discrimination and internal complaints of same to FFL representatives.

115.    On April 19, 2019, Washington was provided with a letter of recommendation from his former supervisor Jeff Swearingen.

116.    Jeff Swearingen told Washington that he recommended that Washington start with a $65,000.00 salary that the other sales team members were making, and Dave Bergland refused.

)

22

117.   After Washington's evaluation in March of 2018 Jeff stated that he went back to Dave Bergland recommending that his salary be increased to $65,000.00, and Dave refused.

118.   On April 24, 2019, Washington was sent a letter from FFL legal counsel accusing him of making disparaging remarks on Glass Door that Washington did not make.

119.   On May 9, 2019, Washington's Charge of Discrimination was signed and filed with the EEOC.

120.   On July 25, 2019, A mandatory sexual harassment / discrimination training was provided by FFL legal counsel at the Forensic Fluids Corporate Office.

121.   "Employer of Choice" interviews results were announced "HMR Culture Accelerator" Washington was told by a few employees that the results were not good. Favoritism shown by upper management.

   a.   Request copy of HMR Culture Accelerator Results

122.   Bridget Lemberg filled out and signed a "Request for Release of Information" form for a potential new employer.

123.   On August 9, 2019, Washington was provided with the Revised Forensic Fluids Laboratories Employee Handbook:  The revision date was July 26, 2019.

124.   Included was the FFL Employee Handbook that Washington was hired under in March of 2017.

125.   The 7/26/19 handbook was revised to include the COO (David Bergland) as one of the main two (Lab Director Bridget Lemberg) to file complaints to.

126. Plaintiff's participation in protected activity was a factor in terms and conditions of Plaintiff's employment as he was subjected to retaliation by FFL's representatives.

127. In January 2020, Plaintiff was replaced by a white female.

128. Plaintiff has documentation to support the racial, gender and EEOC protected activity bias directly caused by the FFL hostile work environment and discrimination.

129. Plaintiff had suffered economic losses and emotional distress as a result of the race/age discrimination and retaliation including his termination for making complaints to FFL authoritative representatives.

130. Plaintiff had numerous meetings with FFL and its decision-making representatives to resolve the issues to no avail prior to being terminated.

131. Since filing the EEOC Charge of Discrimination (EEOC Charge No 471-2019-02231, Plaintiff was treated differently and received the adverse employment action including the abrupt termination on April 16, 2019 from David Bergland.

132. Plaintiff received his EEOC Dismissal on December 9, 2019 and Notice of Rights and has timely filed his lawsuit.

133. Respondent filed its position statement with the EEOC on June 10, 2019. The EEOC never gave a copy to Plaintiff until almost the same date the EEOC issued the Right to Sue on December 9, 2019. Plaintiff had made numerous requests verbally and in writing (e-mails) for case status updates including if the respondent provided a position statement but never received a response from his EEOC investigator until after the EEOC issued the Right to Sue Letter.

## COUNT I
## RACE DISCRIMINATION IN VIOLATION OF TITLE VII CIVIL RIGHTS ACT OF 1964, AS AMENDED AGAINST ALL DEFENDANTS

134. Plaintiff reincorporates by reference the previous paragraphs of the Complaint as though fully set forth herein, word for word and paragraph for paragraph.

135. At all material times, Plaintiff was an employee, and Defendant FFL was his employer, covered by and within the meaning of the Title VII Civil Rights Act of 1964 as amended (Title VII).

136. Plaintiff's race (African American) was at least one factor that made a difference in Defendants' decision to cause adverse employment action of his termination. There is close temporal proximity to the adverse employment actions and the complaints of EEOC protected activity about the unlawful discrimination.

137. Had Plaintiff been Caucasian, he would not had received adverse employment action or had been terminated as younger females similarly situated that brought complaints of discrimination regarding David Bergland were not terminated but given raises or other valuable monetary payouts. Plaintiff was not hired and terminated from the same supervisor. Evidence and facts support that FFL's management was all Caucasian.

138. Defendants, through their agents, representatives, and employees, were predisposed to discriminate based on race, harass based on race, created a hostile work environment and acted in accordance with that predisposition.

139. Defendants, through their agents, representatives, and employees, treated Plaintiff differently from similarly situated non-African American employees in the terms and conditions of employment, based on unlawful consideration of race.

140. Defendants' policies for advancement, promotions and equitable pay were discriminatory on their face for non-Caucasian employees including African Americans.

141. Defendants' actions were intentional in disregard for Plaintiff's rights and sensibilities.

142. As a direct and proximate result of Defendants' unlawful actions, Plaintiff sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of choice.

WHEREFORE, Plaintiff respectfully requested this Honorable Court enter judgment in favor of the Plaintiff, attorney fees and costs and any other relief this Court deems just and equitable.

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII CIVIL RIGHTS ACT OF 1964, AS AMENDED

143. Plaintiff reincorporated by reference the previous paragraphs of the Complaint as though fully set forth herein, word for word and paragraph for paragraph.

144. At all material times, Plaintiff was an employee, and Defendants were his employer, covered by and within the meaning of the Title VII Civil Rights Act of 1964 as amended (Title VII).

145. Plaintiff's internal Complaints to management and human resources (oral and written) about the race (African American) discrimination were at least one or more factors that made a difference in Defendants' decision that caused adverse employment

action and to terminated Plaintiff. There was close temporal proximity of the adverse employment actions and the complaints of discrimination.

146. Had Plaintiff been Caucasian and not filed Complaints of Discrimination, he would not had received adverse employment action or had been terminated as retaliation for the same.

147. Defendants, through their agents, representatives, and employees, were predisposed to discriminate and retaliated based on race and acted in accordance with that predisposition including Plaintiff's protected activity of claims of discrimination.

148. Defendants, through their agents, representatives, and employees, treated Plaintiff differently from similarly situated non-African American employees in the terms and conditions of employment, based on unlawful consideration of race including retaliation.

149. Defendants' policies for advancement, promotions and equitable pay were discriminatory on their face for non-Caucasian employees. Plaintiff was retaliated against for making complaints about the same.

150. Defendants' actions were intentional in disregard for Plaintiff's rights and sensibilities.

151. As a direct and proximate result of Defendants' unlawful actions, Plaintiff had sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of choice.

WHEREFORE, Plaintiff respectfully requested this Honorable Court enter judgment in favor of the Plaintiff, attorney fees and costs and any other relief this Court deems just and equitable.

## COUNT III
## AGE DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA)

152.    Plaintiff incorporated by reference paragraphs 1 through 103.

153.    At all material times, Plaintiff was an employee, and Defendants were his employer, covered by and within the meaning of the Age Discrimination in Employment Act (ADEA).

154.    Plaintiff's age was at least one factor that made a difference in Defendants' decision to terminate Plaintiff and attempt to force him to sign a Settlement Agreement and Release to silence the discrimination.

155.    Plaintiff was not given the same favorable treatment as younger female employees who kept their jobs and were given raises or other monetary benefits including expensive vacations.

156.    Defendants, through their agents, representatives, and employees, were predisposed to discriminate based on age and acted in accordance with that predisposition.

157.    Defendants, through their agents, representatives, and employees, treated Plaintiff differently from similarly situated younger employees in the terms and conditions of employment.

158. Defendants' actions were intentional in disregard for Plaintiff's rights and sensibilities.

159. As a direct and proximate result of Defendants' unlawful actions, Plaintiff had sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of choice.

## COUNT IV
## GENDER DISCRIMINATION IN VIOLATION OF TITLE VII ON THE BASIS OF GENDER AND THE EQUAL PAY ACT OF 1963, AS AMENDED

160. Plaintiff reincorporated by reference the previous paragraphs of the Complaint as though fully set forth herein, word for word and paragraph for paragraph.

161. At all material times, Plaintiff was an employee, and Defendants were his employers, covered by and within the meaning of Title VII Civil Rights Act of 1964 as amended (Title VII) and the Federal Equal Pay Act of 1963, as amended ("EPA").

162. Plaintiff's gender was at least one factor that made a difference in Defendants' decision to not pay Plaintiff the same as other female similarly situated sales representatives from the date of hire until his termination who made complaints of unlawful gender discrimination.

163. Plaintiff was paid less and not given the same monetary benefits as the female employees who made complaints of unlawful discrimination against their same supervisor.

SEC. 206.

(d) Prohibition of sex discrimination

(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

164.    Defendants, through their agents, representatives, and employees, were predisposed to discriminated based on gender and acted in accordance with that predisposition.

165.    Defendants, through their agents, representatives, and employees, treated Plaintiff differently from similarly situated female employees in the terms and conditions of employment, based on unlawful consideration of gender.

166.    Defendants' actions were intentional in disregard for Plaintiff's rights and sensibilities.

167.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff had sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of choice.

WHEREFORE, Plaintiff respectfully requested this Honorable Court enter judgment in favor of the Plaintiff, attorney fees and costs and any other relief this Court deems just and equitable.

## COUNT V
## RACE DISCRIMINATION IN VIOLATION 42 USC 1981
## ACTING UNDER 42 USC 1983

168. Plaintiff reincorporated by reference the previous paragraphs of the Complaint as though fully set forth herein, word for word and paragraph for paragraph.

169. At all material times, Plaintiff was an employee, and Defendants were his employers, covered by and within the meaning of the 42 USC 1981 acting under 42 USC 1983.

170. Plaintiff's race/national origin (African American) was at least one factor that made a difference in Defendants' decision to terminate Plaintiff.

171. Had Plaintiff been Caucasian, he would not had been terminated.

172. Defendants, through their agents, representatives, and employees, were predisposed to discriminate based on race/national origin and acted in accordance with that predisposition.

173. Defendants, through their agents, representatives, and employees, treated Plaintiff differently from similarly situated non-African American employees in the terms and conditions of employment, based on unlawful consideration of race/national origin.

174. Defendants' actions were intentional in disregard for Plaintiff's rights and sensibilities.

175. Plaintiff was treated differently than similarly situated Caucasian employees and/or Defendants' facially neutral employment practices had a disparate impact on Plaintiff.

176. As a direct and proximate result of Defendants' unlawful actions, Plaintiff had sustained injuries and damages including, but not limited to, loss of earnings and

earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of choice.

WHEREFORE, Plaintiff respectfully requested this Honorable Court enter judgment in favor of the Plaintiff, attorney fees and costs and any other relief this Court deems just and equitable.

WHEREFORE PLAINTIFF REQUESTED that this Court enter judgment in his favor against Defendants in whatever amount Plaintiff was found to be entitled, together with costs and interest.

**PLAINTIFF REQUESTS** that this court enter judgment against Defendants as follows:

1.  compensatory damages in whatever amount above $75,000 he was found to be entitled;

2.  exemplary damages in whatever amount above $75,000 he was found to be entitled;

3.  statutory damages in whatever amount he was found to be entitled;

4.  an award of lost wages and the value of fringe benefits, past and future;

5.  an award of interest, costs, and reasonable attorney fees;

6.  an order enjoining Defendants, their agents, representatives, and employees from further acts of discrimination or retaliation;

7.  an order awarding whatever other equitable relief appeared appropriate at the time of final judgment.

Washington verified that the facts stated in this Verified Complaint were true and, if sworn as a witness, he could testify with personal knowledge as to these facts.

Dated:  February 6, 2020

/s/ Darren L. Washington
Darren L. Washington, Plaintiff

Dated:  February 7, 2020

Bruch Law Offices, PLLC

By: Marlo Bruch
Marlo D. Bruch (P70362)
Attorney for Plaintiff
5955 West Main Street, Suites 224-225
Kalamazoo, MI  49009
(269) 312-8169

## PLAINTIFF'S DEMAND FOR JURY TRIAL

NOW COMES, Plaintiff, Darren L. Washington, and hereby requests trial by jury pursuant to FR Civ P 38(b).

Dated:  February 6, 2020

By: Darren L. Washington
Darren L. Washington, Plaintiff

TONA R. SCOTT
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF BERRIEN
MY COMMISSION EXPIRES NOVEMBER 24, 2021
ACTING IN THE COUNTY OF Berrien

Subscribed and sworn before me this 6th day of February, 2020, a Notary Public in and for Berrien County, Michigan.

(Signature)
NOTARY PUBLIC
My Commission Expires 11/24, 2021